UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Stephanie Pisto

_____

_____

_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

Federal Reserve Bank of New York

_____

Dr. Gerald Stagg, Mrs. Karen Schneck, Mr. Kapo Yuen

_____

_____

*(In the space above enter the full name(s) of the defendant(s).
If you cannot fit the names of all of the defendants in the space
provided, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of names.
Typically, the company or organization named in your charge
to the Equal Employment Opportunity Commission should be
named as a defendant.  Addresses should not be included here.)*

**Amended**
**COMPLAINT**
**FOR EMPLOYMENT**
**DISCRIMINATION**

12-cv 5417

Jury Trial:  ☒ Yes   ☐ No

*(check one)*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: ____3/15/13____

This action is brought for discrimination in employment pursuant to: *(check only those that apply)*

_____   Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e
to 2000e-17 (race, color, gender, religion, national origin).
***NOTE:*** *In order to bring suit in federal district court under Title VII, you must first obtain a
Notice of Right to Sue Letter from the Equal Employment Opportunity Commission.*

_____   Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§
621 - 634.
***NOTE:*** *In order to bring suit in federal district court under the Age Discrimination in
Employment Act, you must first file a charge with the Equal Employment Opportunity
Commission.*

☒   Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 -
12117.
***NOTE:*** *In order to bring suit in federal district court under the Americans with Disabilities Act,
you must first obtain a Notice of Right to Sue Letter from the Equal Employment Opportunity
Commission.*

☒   New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297  (age,
race, creed, color, national origin, sexual orientation, military status, sex,
disability, predisposing genetic chacteristics, marital status).

☒   New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to
131 (actual or perceived age, race, creed, color, national origin, gender,
disability, marital status, partnership status, sexual orientation, alienage,
citizenship status).



## I.        Parties in this complaint:

A.        List your name, address and telephone number.  Do the same for any additional plaintiffs named.  Attach additional sheets of paper as necessary.

Plaintiff        Name  Stephanie Pisto

Street Address  1032 Willowleaf Way

County, City  Montgomery, Rockville

State & Zip Code  Maryland 20854

Telephone Number  773-230-7815

B.        List all defendants' names and the address where each defendant may be served.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.  Attach additional sheets of paper as necessary.

Defendant        Name  Please see attached

Street Address

County, City

State & Zip Code

Telephone Number

C.        The address at which I sought employment or was employed by the defendant(s) is:

Employer  Federal Reserve Bank of New York

Street Address  33 Liberty Lane

County, City  Manhattan, New York

State & Zip Code  New York, 10048

Telephone Number  212-720-6130

## II.        Statement of Claim:

State as briefly as possible the <u>facts</u> of your case, including relevant dates and events.  Describe how you were discriminated against.  If you are pursuing claims under other federal or state statutes, you should include facts to support those claims.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases.  If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.  Attach additional sheets of paper as necessary.

A.  The discriminatory conduct of which I complain in this action includes: *(check only those that apply)*

_____        Failure to hire me.

___X___        Termination of my employment.

___X___        Failure to promote me.

___X___        Failure to accommodate my disability.

___X___        Unequal terms and conditions of my employment.

$\times$    Retaliation.

$\times$    Other acts *(specify)*:  Lack of interactive process & Hostile work environment  .

**Note:**    *Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.*

B.    It is my best recollection that the alleged discriminatory acts occurred on: Oct 2005-Jan 2013  .

*Date(s)*

C.    I believe that defendant(s) *(check one)*:

_____    is still committing these acts against me.

$\times$    is not still committing these acts against me.

D.    Defendant(s) discriminated against me based on my *(check only those that apply and explain)*:

☐    race    _____    ☐    color    _____

☐    gender/sex    _____    ☐    religion_____

☐    national origin    _____

☐    age.    My date of birth is _____ *(Give your date of birth only if you are asserting a claim of age discrimination.)*

☒    disability or perceived disability,  Learning, ADHD & Immune Deficiency  *(specify)*

E.    The facts of my case are as follow *(attach additional sheets as necessary)*:

Please see that attached.

_____

_____

_____

_____

_____

_____

_____

**Note:**    *As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights or the New York City Commission on Human Rights.*

## III.    Exhaustion of Federal Administrative Remedies:

A.    It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding defendant's alleged discriminatory conduct on:  March 10, 2011  *(Date).*

B.    The Equal Employment Opportunity Commission *(check one)*:

                       has not issued a Notice of Right to Sue letter.

    X     issued a Notice of Right to Sue letter, which I received on April 18, 2012 _____ *(Date)*.

> *Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.*

C.    Only litigants alleging age discrimination must answer this Question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct *(check one)*:

                       60 days or more have elapsed.

                       less than 60 days have elapsed.

# IV.    Relief:

WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, and costs, as follows: Compensatory damages including: denied variable pay and pay raises, retroactive promotions, pay raises, and contributions to retirement accounts, mental anguish, inconvenience, legal fees, and cost of acquiring additional documentation.

*(Describe relief sought, including amount of damages, if any, and the basis for such relief.)*

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this 13 day of March _____, 20 13.

                     Signature of Plaintiff    *Stephanie Pisto*

                     Address    1032 Willowleaf Way

                                Rockville, MD 20854

                     Telephone Number    773-230-7815

                     Fax Number *(if you have one)* _____

*Rev. 05/2010*

Supporting Documentation for Amended Complaint
Re: Pisto v. Federal Reserve Bank of New York
12 Civ. 5417 (JGK) (AJP)

**Defendants:**
Federal Reserve Bank of New York
33 Liberty Lane
Manhattan, New York
New York 10045
(212) 720-6130

Dr. Gerald Stagg
Federal Reserve Bank of New York
*Senior VP and Medical Director*
*Compensation and Benefits, Health and Wellfare*
33 Liberty Lane
Manhattan, New York
New York 10045
(212) 720-6130

Ms. Karen Schneck
*Assistant Vice President, Models and Methodologies*
Federal Reserve Bank of New York
33 Liberty Lane
Manhattan, New York
New York 10045
(212) 720-6130

Mr. Kapo Yuen
Federal Reserve Bank of New York
33 Liberty Lane
Manhattan, New York
New York 10045
(212) 720-6130


**The Facts of My Case**
I was employed by the Respondent as a Senior Bank Examiner B, Capital Assessments Team, in the Models and Methodologies Department.

I was employed by the Respondent from September 2005 through March 2011.

I am disabled, as that term is understood under the Americans with Disabilities Act of 1990/Americans with Disabilities Act Amended Act (hereinafter, "ADAAA"), the New York State Executive Law section 296 (hereinafter, "NYSEL"), and the New York City Human Rights Law Administrative Code section 8-107 (hereinafter, "NYCHRL").

1

The Federal Reserve Bank of New York (FRBNY) has both discriminated against me and retaliated against me based on Title I of the ADAAAA, NYSEL, NYCHRL and their own internal EEO/non-discrimination policy. I have several disabilities, with documentation for each, that are covered under Title I of the Americans with Disabilities Act Amendments Act of 2008 (ADAAA). As such I am entitled to reasonable accommodation from my employer to enable me to perform duties, as long as the accommodations do not produce an undue hardship on the firm.

The charges in this complaint are pursuant to ADAAA, NYSEL and NYCHRL with the following exceptions.  The claim of discrimination due to an immune deficiency, and individual liability of Dr. Gerald Stagg and Ms. Karen Schneck is pursuant to NYSEL and NYCHRL. The claim of individual liability of Mr. Kapo Yuen is pursuant to the NYCHRL.

**Establishment of qualified disabilities covered by the ADAAA**
I suffer from learning disabilities (LD), attention deficit hyperactivity disorder (ADHD) (sometimes referred to as Attention Deficit Disorder (ADD)), and an immune deficiency, specifically IgA and IgG-2 deficiency. LD and ADHD are neurologic disorders that last a lifetime and they have a high comorbidity rate.  My LD were first diagnosed by a qualified medical practitioner when I was in the 4th grade, in 1977[1]. Since then, I have undergone diagnostic testing four additional times: in 1988[2], 1994[3], January 2010[4] and December 2010[5]. The findings in these reports are all consistent: I am intelligent, and I have neurological disabilities which warrant accommodation to mitigate their effects.  My immune deficiency was diagnosed in 2005 by Dr. Clifford Basset, Director of Allergy and Asthma Care of New York, which specializes in allergy, asthma and clinical immunology.

The ADAAA has the most restrictive definition of covered disabilities and establishing that my disabilities are covered disabilities under ADAAA also demonstrates they are covered disabilities for the NYSEL and NYCHRL.

The ADAAA regulation defines "physical or mental impairment" as any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin and endocrine. They also cover any mental or psychological disorder, such as intellectual disability (formerly termed mental retardation), organic brain syndrome, emotional or mental illness, and specific learning disabilities. [Section 1630.2(h)] My LD, ADHD, and immune deficiency are all qualified disabilities covered by the ADAAAA.

---

[1] The George Washington University Reading Room, 1977

[2] Phycho-education evaluation, 1988, Dr. Bernard Feierstein

[3] The University of Chicago: Academic and Social Skills Evaluation and Tutoring Services, 1994

[4] Physician Dr. Katherine Schneebaum, Jan 2010

[5] The Mount Sinai Medical Center, Department of Psychiatry and ADHD Center, Dec 2010

To date, the FRBNY has only acknowledged my LD as a disability covered under the ADAAA; they have not acknowledged my ADHD or immune deficiency as covered disabilities.

## Grounds for the discrimination claim under the ADA

Below are two bullet points from the Technical Assistance Manual: Title I of the ADA published by the EEOC under the heading Actions Which Constitute Discrimination that are relevant to the case. The majority of this document addresses the first issue. The second, a byproduct of the first, is addressed after.

- Refusing to make reasonable accommodation to the known physical or mental limitations of a qualified applicant or employee with a disability, unless the accommodation would pose an undue hardship on the business.
- Limiting, segregating, or classifying a job applicant or employee in a way that adversely affects employment opportunities for the applicant or employee because of his or her disability.

In addition, the FRBNY participated in several forms of retaliation, which is also considered discrimination.

## My submission of accommodation requests

Shortly after I began work at the FRBNY in 2005, I made a request for a reasonable accommodation based on my learning disabilities. I submitted a request to Dr. Gerald Stagg in the medical department requesting extended time when taking the Commissioning Exams. I never received a response from the Medical Department, despite resubmitting the request several times in 2005, 2006 and 2007. When I met in person with representatives from the department in charge of commissioning training about whether they had received communication from Dr. Stagg about my request for reasonable accommodation, they said they had not. In 2008, I formally withdrew from the Examiner Commissioning Training program as I was never able to received reasonable accommodations. Among the benefits of completing the commissioning training was a percentage increase in base salary.

Between 2006-2008, I asked for and subsequently received several accommodations for my disabilities. The reasonable accommodations granted to me included the provision to me of mind-mapping and dictation software (2006), a Blackberry, which was used for scheduling issues (2006) and the services of an editor (2007) when I requested it. I found these accommodations very helpful in carrying out my job responsibilities and I believe my annual reviews from 2006 and 2007 support this claim as my performance ratings improved.

In the first half of 2008 I lost access to the mind-mapping and dictation software when I received a new computer. I attempted to obtain the software for my new computer, but was never able to obtain it again, despite my numerous requests for same. One of the barriers to obtaining the software again was not knowing to whom to submit my requests.

3

I have never received a response from Dr. Stagg or the Medical Department in response to my previous requests. The person who initially helped me secure reasonable accommodations left her position and these responsibilities of the position were never assigned to anyone new. I made requests to my managers, to the head of Resource and Logistics Management within Bank Supervision (FRBNY human resources department), the person responsible for diversity in the workplace and the EEO, but no one was able to direct me to the proper person or office regarding the granting of accommodations. There was also nothing in the Federal Reserve's Intranet about who to contact to request accommodations.

I lost use of the editor in October 2008 when I received a new manager. My manager, Kapo Yuen, did not allow me to use the editor without getting prior approval, but my manager could not tell me how to get approval.

In December 2009, I contacted Dr. Stagg and the Medical Department to attempt to arrange for accommodations of my disabilities, at the suggestion of the Personnel Office.

At that time, I specifically requested the use of a Job Coach and the previous accommodations that I had lost. (Note: I did not lose my Blackberry in 2008, but at that time, a Blackberry was no longer considered an accommodation as they had become very prevalent among FRBNY examiners.). Dr. Stagg responded to my request by suggesting that I meet with Kim Widansky, within the medical office, to discuss my concerns.

I was able to schedule a meeting with Kim Widansy in January 2010. I wrote her an email detailing my situation, the performance problems that were due to my disables being unaccommodated and asking her for help with his process. When we met, she told me she had no idea how to find a job coach or how to proceed. When I left, I told her I would research on the internet and get back to her. On January 25, 2010, I provided another formal written request for accommodations of my learning disabilities and ADHD. I submitted all the required documentation, and specifically asked for provision of an editor and a job coach, two reasonable ways to accommodate my conditions, as well as the software that had helped me in the past.

Prior to submitting my documentation for ADD/ADHD in January 2010, I contacted the Job Accommodation Network (JAN), which is part of the U.S. Department of the Labor. I wanted to make sure that I provided specific and sufficient documentation of my ADD/ADHD disabilities, because while problems with attention are mentioned in my previous documentation, nothing specifically used the label ADD or ADHD. I also wanted the granting of accommodations to go smoothly because my performance had been suffering since my previous accommodations had been removed approximately 18 months prior and at that time, I had never received a response for any accommodation request (LD or ADHD) from Dr. Stagg or anyone within his Medical Department. I consulted with JAN prior to meeting with my physician and after I received the documentation from my physician. JAN confirmed that my documentation was sufficient to establish that I had an ADAAA covered disability, that I needed accommodations and that the documentation had been provided by a qualified health professional.

In mid-February 2010, I inquired of the Medical Department via email regarding my accommodation request.   The email response from Kim Widansky was vague and unhelpful. She replied that my request was being reviewed by management, but she could not tell me who was responsible for making a decision nor when I could expect a response.

In March 2010 I learned that the Medical Department communicated with my physician twice under the pretext that additional documentation was required.  Dr. Stagg wrote that my ADD is an '"alleged" disability' and requested to know which diagnostic tests were used to make a diagnosis.

I contact JAN by email and on the phone and asked for help in how to proceed. They were shocked with the response I received from Dr. Stagg for three reasons.  First, under the ADAAA he is not allowed to challenge a diagnosis from a qualified medical professional. Second, by requesting the diagnostic tools that were used in the evaluation he was requesting information that he is not legally entitled to. And third, by requesting that the medical professional provide justification on the appropriateness of the accommodation I requested, he was asking the medical professional for information that is not required to be provided by the medical professional. JAN told me that if Dr. Stagg continued these requests, his behavior could be considered retaliation.  JAN suggested that Dr. Stagg needed to know that what he was requesting was not information he was legally entitled to, nor was it his place to challenge the diagnosis.

To help me craft my response tactfully and professionally, I contacted the FRBNY ombudsman office. The ombudsmen that I worked with helped me frame my response to Dr. Stagg.  I also requested that he review my annual reviews and compare them with the documentation he already had on my disabilities and said that I believed all the information he needed was available in those documents.  I asked her advice about having a face-to-face meeting with him; she did not encourage that route because she did not think it would be productive.

Dr. Stagg withdrew his request for the diagnostic tools, but he still did not accept that I was diagnosed with "ADD/ADHD." He continued to request inappropriate information and completely disregarded my request for him to review my annual reviews.

I had reached an impasse with Dr. Stagg, and there was no one for me to appeal to within the FRBNY.  I went to my manager and team leader, Kapo Yuen, and Department Manager Karen Schneck and asked for their help in how to move forward.  At the time, all they suggested was that I keep the lines of communication open with Dr. Stagg.

Over the next 12 months, I made numerous requests for reasonable accommodations in writing and verbally from my managers, the medical department, and co-workers.  I submitted written requests to Kapo Yuen and Karen Schneck on my annual reviews, my official warnings, and on my resignation papers.  Kapo Yuen and Karen Schneck told me that Dr. Stagg had told them that they may not take my disabilities into account when they write evaluations of my performance and that they were not to provide any accommodations to me.  On three different occasions, I wrote to Karen and Kapo and

5

requested that they reassign me to different responsibilities until I was able to negotiate some accommodations with Dr. Stagg. They never responded to my requests. I asked to work with a professional development candidate whom I would mentor and they could assist me with writing and dealing mundane task, like recording time.  Kapo initially responded that he would see what he could do and asked me for additional information, but I never received a yes or no response to that request. My last written request for reasonable accommodations was on March 14, 2011, in response to Employee Official Warning Records. Under the Employee Comments section in the "Employee Official Warning Record" I wrote, "My disability accommodations were taken away in 2008. I have been trying to get them back for several years.  The issues in this memo are all well documented limitations that were and can be addressed with simple accommodations, which I am legally entitled to." I wrote that failure to accommodate my disabilities is why I was resigning from the firm.

I made verbal requests for accommodations each time I participated in a discussion with Karen Schneck or Kapo Yuen or both about new assignments, feedback on existing assignments, during annual reviews, and while discussing action plans for improving my performance. In addition, I made requests to the Medical Department, and I never received responses.

Each of my numerous requests for accommodation, both verbal and written, met the submission requirements provided by the EEOC and the FRBNY. The Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (EG) from the ADA Division, Office of Legal Counsel states "Requests for reasonable accommodation do not need to be in writing." Additionally, "...an employer may ask the individual to fill out or submit the request in written form, but the employer cannot ignore the initial request." The FRBNY's internal EEO policy has no requirements regarding to whom or how requests are submitted.

To support my requests for accommodation, I submitted documentation and reports that I received prior to my employment at the FRBNY and additional documentation that I procured during my employment. I provided the FRBNY with the results of my diagnostic testing to demonstrate that I have LD, ADHD, and an immune deficiency.

The FRBNY granted some reasonable accommodations from 2005 through 2008. In 2008, the FRBNY removed all of my reasonable accommodations.  The EG states that "the duty to provide reasonable accommodation is an ongoing one."

My request to have my accommodations reinstated was not responded to, and requests for new accommodations were never approved. I had no accommodations for the remainder of my employment through 2011. The EG states a lack of action in these circumstances amounts to a denial, and thus violates the ADA.

I have no log of my verbal requests. Kapo Yuen told me on more than one occasion that he didn't understand disabilities, he didn't want to understand disabilities, and he didn't want to have to think about them when evaluating performance. During conversations with Kapo

6

Yuen and Karen Schneck about how to improve my performance, they both said they would support me anyway I thought would be helpful, with the exception being that they could not provide accommodations. In a conversation with Karen Schneck about my recurrent sinusitis due to the immune deficiency, she suggested that I rinse my sinuses with a netti pot in order to avoid getting sick and needing to take time off due to illness. I suspect the FRBNY also does not have a log of my verbal requests since my management took this position.

I have the following documentation that shows that I requested accommodations and that they were provided from 2005 through 2008:

- An email from my manager from my hire date in 2005 through late 2008 that states he was made aware that I have learning disabilities that interfere with performing my work responsibilities. He worked with Twana Harris in Resource and Logistics Management (RLM) within Bank Supervision to develop a set of accommodations. The accommodations included two software packages as adaptive technology and the use of an editor. The accommodations were fully paid for by the FRBNY.
- I have emails from the Information Technology department of Bank Supervision stating that they ordered the computer software, paid for it and installed it on my work laptop.
- I have emails from the editor I used stating that she was hired and paid for by the FRBNY to provide me with editing services. I also have her FRB vendor profile form, and a copy of the invoice she submitted to the FRBNY for services she provided me and the FRB payment/ACH form for payment by direct deposit.

**EG violations from the FRBNY's response to my submissions**

Since 2008, the FRBNY violated the following requirements of the EG as listed under Requesting Reasonable Accommodation.

1. "What must an employer do after receiving a request for reasonable accommodation?

   The employer and the individual with a disability should engage in an informal process to clarify what the individual needs and identify the appropriate reasonable accommodation. The employer may ask the individual relevant questions that will enable it to make an informed decision about the request. This includes asking what type of reasonable accommodation is needed."

   The FRBNY did not engage in this process.

2. "Are there situations in which an employer cannot ask for documentation in response to a request for reasonable accommodation?

   Yes. An employer cannot ask for documentation when: (1) both the disability and the need for reasonable accommodation are obvious, or (2) the individual has already

7

provided the employer with sufficient information to substantiate that s/he has an ADA disability and needs the reasonable accommodation requested."

Both conditions apply to my case. Because of the thorough documentation of my performance in my annual reviews, and because the shortcomings listed in the annual reviews are documented deficiencies due to my disabilities, both my disabilities and the need for reasonable accommodation were obvious. Secondly, I provided the FRBNY with all of my disability documentation, and yet the FRBNY contacted my doctor for additional information.

3. "May an employer ask an individual for documentation when the individual requests reasonable accommodation?

In requesting documentation, employers should specify what types of information they are seeking regarding the disability, its functional limitations, and the need for reasonable accommodation. The individual can be asked to sign a limited release allowing the employer to submit a list of specific questions to the health care or vocational professional."

The FRBNY contacted my doctor without my consent and without having me sign a limited release. In additional to violating ADA, this would have been a violation of HIPAA had my doctor provided any information.

Both what the FRBNY did and did not do were violations of the EEOC's Enforcement Guidance.

**Dr. Stagg's behavior in substantiating a discrimination/retaliation claim and his personal liability.**
When I submitted documentation in Jan 2010 by a qualified health professional that I had been formally diagnosed with ADD, Dr. Stagg wrote a response dated Feb 25, 2012, that called the ADD an "alleged disability" and asked which diagnostic tests were used in the evaluation. While he later rescinded the request to identify the diagnostic instruments, he continued to request additional information that was obvious (e.g., the duration of the disability, which is a lifelong disability) or that was readily available to him (e.g., additional information on the effects of the disabilities, which are documented in my annual reviews as criticism of my performance) or asking which specific tasks in my essential job function description my disability related to, when my disabilities are executive function disorders and are cross-functional, and do not tie to a specific task (e.g., difficulties beginning tasks).

According to JAN "when an employee requests an accommodation and the disability or need for accommodation is not obvious, an employer may require that the employee provide medical documentation to establish that the employee has an ADA disability and needs the requested accommodation6."  Dr. Stagg had valid documentation establishing

---

[6] *Medical Inquiry in Response to an Accommodation Request* at
http://askjan.org/media/medical.htm.

that I have an ADA disability, and a list of how it affects me, and he challenged the diagnosis and repeatedly requested unnecessary additional information. The EEOC has stated that when an employee provides sufficient evidence of the existence of a disability and the need for reasonable accommodation, continued efforts by the employer to require that the individual provide more documentation and/or submit to a medical examination could be considered retaliation7.

**Discrimination resulting from the lack of accommodations**
The effects of the withdrawn accommodations and the resulting discrimination are well detailed in the annual performance reviews.

In my yearly performance evaluations, I was consistently recognized for my superior financial knowledge, technical and analytical skills and capacity to communicate concisely and effectively about difficult technical matters to institutions and other examiners. These skill sets are unrelated to my disabilities.

Prior to 2008, the accommodations provided by the FRBNY enabled me to effectively manage my output. The accommodations included an editor to assist with written documents, a blackberry, and software for the dictation of reports and the organization of documents. As clearly indicated in a depiction of my annual performance (Fig. 1, attached) I received high ratings in all five performance areas between 2005 and 2008, when these accommodations were in place, but sub-optimal performance in self-management and other areas in 2009 and 2010, after the accommodations were removed.

When the annual reviews are compared to the documentation of disabilities, it is easy to observe that the effects of the disabilities were mitigated with the establishment of accommodations in 2005. Similarly, after accommodations were removed in 2008, the criticisms in the annual reviews are characteristic consequences of my disabilities.

In the section of the annual reviews that look to the future, I am repeatedly encouraged to work on the challenges I face that stem from my disabilities. However, despite repeated requests, I was denied the reasonable accommodations required to successfully meet those challenges. The following annual reviews state that I failed to make the required changes in my performance.

In 2010, the nature of several tasks assigned to me changed and the new tasks were significantly more difficult for me, given my LD. In order to complete them to expectations, I would have needed additional accommodations beyond what was previously requested. I did request to be removed from these assignments. One major assignment involved searching databases in an area that was not within my expertise. In addition, there were no spell check capabilities in the database program. When I would perform a search and get no results, I had no way to distinguish between possible spelling errors on my part or that

---

[7] http://www.eeoc.gov/policy/docs/guidance-inquiries.html#N_60_Reasonable Accommodation Under the ADA, supra note 6, at 15 (n.30), 8 FEP at 405:7609.

The searched for elements were just missing from the database. After numerous attempts to be removed from that assignment, my manager, Kapo Yuen finally agreed. However, in my official warning for poor performance, Kapo cited my failure to complete that database search project as evidenced of my inability to perform.

According to my most recent disability documentation, "further compounding Stephanie's performance issues were the types of assignments she has been given. Her assignments have changed from complex data analysis, interpreting policies and teaching/mentoring to database searches, skimming documents and formatting data. The previous assignment types tapped into Stephanie's strengths. The new assignments, however, while appearing mundane, are significantly more difficult for Stephanie to perform, since these assignments require skills where Stephanie has known deficits. For her to complete them satisfactorily would require additional accommodations beyond what was discussed in this report."

Additionally, the testing methodologies ruled out that any other condition (e.g., anxiety, depression) as being the primary cause of my difficulties. However, the medical documentation reported that my mild depression was likely a consequence of my impairment at work.

**Specific examples**
1) My diagnostic documentation requests accommodations to address the following deficits commonly experiences by adults with dyslexia, specific to me, and reported by the FRBNY as being areas of impairment.

- Difficulties in efficiently organizing information in verbal and written form
- Better oral skills than written skills when expressing knowledge
- Poor proofreading and spelling skills

The following excerpts from annual reviews and a warning demonstrate that the failure to provide reasonable accommodations resulted in discrimination based on dyslexia.

a) 2008
"At times, Stephanie's oral explanations are clearer than some of her written products. But when Stephanie is asked to provide additional clarity to the written work she is conscientious to do so."

"Stephanie would increase her professionalism and stature if she continued to work on ensuring that her emails are clear, for example via increased utilization of the spell-check function which is available in Word, Lotus Notes and on Blackberries."

b) 2009
"However at writing up the Tri-Party Margining Analysis, she appeared to be disorganized in summarizing her findings and needed some help from her managers to organize the conclusions."

10

"Stephanie can produce good work if given ample time and if able to organize her thoughts."

c) 2010
"At other times she was disorganized in focusing on the key issues and formulating her findings.
It is well recognized by her management and her colleagues that Stephanie can produce good work if she is able to be more organized."

2) My diagnostic documentation requests accommodations to address the following deficits commonly experiences by adults with ADHD, specific to me, and reported by the FRBNY as being areas of impairment.

- Time management and organization
- Attention to detail
- Expressive Language
- Verbal impulsivity
- Punctuality and attendance

The following excerpts from annual reviews and a warning demonstrate that the failure to provide reasonable accommodations resulted in discrimination based on ADHD.

a) 2008
"There were however, also areas where Stephanie demonstrated the need for growth, specifically some of her interpersonal communication and self-management skills... (T)here were some lapses in these areas that unfortunately did not reflect well on Stephanie's performance."

"It is hoped that Stephanie will work diligently to appropriately reflect professionalism in all areas... so that her Team Leader can give Stephanie the full recognition of her abilities that she is truly capable of performing to."

"Stephanie often has positive intention in her communications, but they may not necessarily come out that way."

"It is a shame when her intentions and contributions get somewhat overshadowed in they are delivered in a less than professional context."

"There were some notable lapses in self-management...that led to results below expectations and unfortunately impacted the high quality work that she could and should be known for. What is most upsetting about the situation was that Stephanie had invested material work in preparing...and did an excellent job of it. She could not be recognized for those efforts due to the inability to manage the logistics properly."

b) 2009

"Stephanie's continued inability to properly estimate the time needed to complete assignments has prevented her from meeting the objectives set for her positions and salary grade."

"Stephanie required many reminders from the EIC [examiner in charge] to manager her time appropriately. ...The EIC also noted that her time management skills and project management skills were inadequate for a senior examiner."

"This highlights the fact that if Stephanie can address her time management issues, she can be a very strong contributor to Bank Supervision."

"Stephanie was coached that there was a need for improvement in some of her interpersonal communications and self-management skills. However we did not observe any improvement of her performance in these two areas during this appraisal period."

"Stephanie will also need to improve on her ability to properly estimate time to complete tasks so that they are completed consistently within a timeframe that is reasonable for someone in her position and salary grade."

"Stephanie is facing some difficult challenges in time management – missing deadlines, missing meetings – that eventually impacted her active participation."

"By more skillfully managing her time on deliverables, Stephanie will be improving on her leadership qualities. Stephanie has proven herself in the past – she can really be a great contributor to the entire department via her technical skills and mentoring of more junior examiners."

"Over the course of the next year it is expected that Stephanie will improve significantly in the areas that are not meeting expectations, namely self-management and leadership. Further deterioration in these areas could jeopardize her overall performance."

c) 2010

"Stephanie continued to have notable lapses in self-management, which impacted her ability to meet all of her commitments and deliver results."

"One common theme expressed by the EICs was that they all had to spend extra time monitoring Stephanie's exam progress during the review, which created disruption to the flow of the exam. They indicated Stephanie needs to improve her leadership skills and exercise more self-management."

12

Figure 1



## Stephanie Pisto's Performance

Exceeds Expectations all Categories

received accommodations

accommodations taken away

Meets Expecations in all categories

Fails to meet Expectations at least 1 Category

2005    2006    2007    2008

- Self Management
- Relationships/Collaboration
- Communication
- Leadership
- Knowledge & Skills

2009

2010

Fails to meet Expectations in all Categories

Performance Appraisal Year

Align top of FedEx Express® shipping label here.



**earthsmart**

FedEx carbon-neutral
envelope shipping

ORIGIN ID: PIZA (703) 720-2554
MAIL OPERATIONS
CAPITAL ONE SERVICES
1680 CAPITAL ONE DR.
INT. ZIP: 19050-0200
MCLEAN, VA 22102
UNITED STATES US

SHIP DATE: 14MAR13
ACTWGT: 0.3 LB
CAD: 0744453/CAFE2605

BILL SENDER

TO **PRO SE OFFICE**
**U.S. DISTRICT COURT**
**500 PEARL ST**
**SUITE 200**
**NEW YORK NY 10007**

DEPT: STAEPHANIE PISTO          REF: 12208

**FedEx**
Express

**E**

TRK# 0201  **5469 7177 1093**

**FRI – 15 MAR 3:00P**
**STANDARD OVERNIGHT**

**EA PCTA**

DSR
10007
NY-US  EWR

RECEIVED

PRO SE OFFICE